MRS. NANNIE TRICE, et al. v. NEWT McGILL, et al.

Western Section. July 31, 1928.

Petition for Certiorari denied by Supreme Court, January 12, 1929.

Ross & Ballew, of Savannah, for appellants.

Anderson & White and Galbraith & Mitchell, of Henderson, for appellee.

HEISKELL, J.  The bill was filed in this cause by Nannie Trice and her husband, J. T. Trice, on the 11th day of June, 1927, against their nephew, Newt McGill, and his four infant children, Carltine McGill, Willie Nell McGill, A. J. McGill and Mozelle McGill, to have set aside and cancelled a deed made by complainants to said four infant children on the 4th day of July, 1922, to a tract of land containing one hundred acres, situated in the Second Civil District of Chester county, Tennessee, the complainants reserving to themselves a life estate and "the rents and profits and benefits of said tract of land so long as either of them lives."

The deed referred to recites a consideration of one dollar paid and the love and affection the grantors have and entertain for the children of Newt McGill who is a nephew. The bill after alleging that the grantors raised Newt McGill as their own child, charges that he induced them to execute said deed upon false and fraudulent representations that he and his family would move into the home of complainants, on said farm and that they would provide for the complainants and take care of them in their old age. That for about a year prior to the execution of the deed, Newt McGill begged, urged, pleaded with persuaded and cajoled complainants to execute said deed, always promising them that he would amply provide and care for them in their old age and see that they did not want for anything, and that in this way they were induced to execute said deed.

The bill charges that there was no other consideration for said deed, than as shown in the bill and in the deed itself. That defendant Newt McGill did not in any manner carry out and perform his said promises and that at the time said promises were made, the said Newt McGill had no intention of carrying out the promises so made to complainants.

The bill further states that the defendant, Newt McGill, moved with his family to said farm in October, 1922, and lived in the home of complainants until October 27, 1924, and it is charged that when he moved away it was in violation of his agreement to care for complainants during their lives. The bill charges that while defendants were living on said place, Newt McGill cut and sold more than $1000 worth of valuable timber, and that during this time the barn on the place burned and the insurance $150 was collected and of this, complainants received $100 and Newt McGill $50.

The bill contains this:

"Complainants charge that the defendant, Newt McGill, conceived this scheme to mulct and defraud complainants by persuading them to execute this deed by reason of his false and fraudulent representations and promises, that he had no in-

tention of fulfilling and carrying out these promises, but that they were a part of his scheme to defraud them of the value of their farm, by having the deed made to his minor children and then taking possession of said farm and converting the timber, barn and the crops growing thereon and appropriating them to his own use, and as soon as he had accomplished this scheme, he moved away and left these complainants destitute and stripped of their savings and the benefits of their labors of more than fifty years. That they are now in destitute circumstances and because of their infirmities and poverty they are largely dependent upon the charity of their neighbors.''

The prayer of the bill is that the said deed be declared void and cancelled and that a decree be rendered against Newt McGill for the value of the timber cut, the insurance collected and the rental value of the land.

Newt McGill answered and admitted that he was the nephew of complainant, J. T. Trice, and was raised by complainants. He admits the execution of the deed conveying said land to his minor children, but denies that it was made at his instance and request and denies that he in any way by word or act induced complainants to execute said deed and denies that he made any fraudulent representations to complainants of any sort to induce the execution of said deed. That no promise was made at the time of the execution of said deed, but that some time after said deed was executed by complainants conveying the remainder interest in said land to respondent's minor children, at the solicitation of complainant, J. T. Trice, he did agree to move with his family to said place and take care of complainants and that he did this in good faith and moved on the place fully intending to carry out said agreement, and did take charge of the farm and operate it for two years, taking care of and supporting complainants in full and complete compliance with said agreement. That he did a great deal of work and spent a good deal in fixing up, repairing and improving said place and when he moved away it was through no fault of his but at the instance of complainant, J. T. Trice. That the conduct of said complainant made it very unpleasant for defendant McGill and his wife and that finally said J. T. Trice told him to leave and get him another place.

The minor defendants first demurred to the bill and then answered by guardian ad litem, adopting the answer of Newt McGill.

The Chancellor found and held that the allegations of the complainants' bill were fully made out and sustained. That the deed was made in consideration of the promise of defendant Newt McGill, and that said defendant thus procured said deed to be executed to his minor children with no intention upon his part to comply

with said contract, and that said McGill is insolvent and that complainants are entitled to have said deed set aside and cancelled, and it was decreed accordingly. It is also decreed that complainants recover of Newt McGill $200 for the timber cut and removed, but that his support of complainants for 1923 and 1924 with improvements on the place satisfied the rents claimed. The decree also allows a recovery in favor of the wife of Newt McGill for $258.63 on account of a deed of trust on said land paid off by her out of her own means.

From this decree the minor defendants by their guardian ad litem have appealed and assigned errors. The other defendants hav not perfected appeals.

The first assignment of error is that the court should not have overruled the demurrer. This is not well taken. The bill sets out a case for relief.

The second assignment is that there is no evidence to support the decree and the third is that the decree is against the preponderance of the proof.

Counsel for complainants, now appellees, insist that the third assignment cannot be considered for the reason that the case was heard by consent on oral testimony and therefore the findings of the Chancellor have the same force and effect as the verdict of a jury. This question is important and must first be disposed of.

The contention of counsel is that the case being heard by consent on oral proof without the consent being in writing as required by the Act of 1917, chapter 119, that the case was tried as a case at law and is not for trial de novo in this court. Two cases are cited to support this contention. Watkins v. Sedberry, 155 Tenn., 148, and Wright v. Dorman, 155 Tenn., 189. These cases do hold that where the agreement to try on oral testimony is in writing according to the statute, it does not give the decree the force of a jury verdict, but leaves the case for hearing de novo on appeal. They do not hold that where the agreement to try on oral testimony is not in writing the decree has the force and effect of a jury verdict. Neither reason nor authority is advanced to support such a distinction. There was no agreement that the Chancellor should hear the case as a jury, and the only case in which this will be implied is where a jury has been demanded, thus making the case a jury case, and then the jury is waived and it is agreed that the case may be heard on oral testimony. In other cases we take it there must be not only an agreement to try on oral proof, but that the case may be heard by the Chancellor sitting as a jury, in order to prevent a hearing de novo on appeal.

We are, therefore, of the opinion that this court may consider whether or not the decree of the court below is in accord with or

contrary to the weight of the evidence or whether the complainants have made out their case, as alleged in the bill by a preponderance of proof.

It is alleged in substance, that the defendant, Newt McGill, overreached the complainants by fraudulently inducing them to convey the remainder interest in said land to the children of said McGill in reliance upon and influenced by promises which he intended at the time not to carry out. It was conceded by counsel for complainants that this must all be proven in order to avoid the conveyance. In other words, if Newt McGill promised as the bill alleges, intending in good faith to carry out his agreement, and for some reason operating afterwards did not do so, he may be held liable in damages, but the deed cannot be set aside as void. Of course the subsequent conduct of McGill may be looked to as bearing on his fraudulent intent at the inception of the transaction, but the fraudulent intent at the time must be shown.

(1) For defendants, the contentions are made: That the agreement to live with complainants and take care of and support them was not the consideration for the deed to the children nor the inducement to it. That complainants had made up their minds to deed the remainder interest in the land to the children and had made the deed before anything was said about the agreement on the part of McGill to live with and support them. (2) If this is not supported by the proof, still there is no evidence to support the finding that Newt McGill entertained a fraudulent purpose at the inception of the transaction resulting in the conveyance. (3) If the contract was the consideration for and inducement to the execution of the deed to the children, the defendant, McGill, entered upon the performance of the contract in good faith and continued to carry it out until complainant, J. T. Trice made it impossible for him to stay on the place longer and ordered him to leave. So that Trice and not McGill breached the contract. (5) As a matter of law the deed cannot be set aside and cancelled unless it contained a provision for forfeiture, citing for the proposition, Goodman v. Skelton, 2 Tenn. Chy. App., 283 at 292, Robertson v. Bowman, 2 Tenn. Chy. App., 181, at 188, Carney v. Carney, 138 Tenn., 647, at 652.

These authorities hold that when the agreement to support is the consideration for the deed that it will not be treated as a condition subsequent unless the instrument is so framed as to make it so. That is, provides for a forfeiture in case of failure to perform. And that cancellation or rescission is not the remedy, even where there has been a total failure to support, unless, of course, the deed was taken by the grantee with no intention to comply. In

the present case there is no provision for a forfeiture, so it is clear that in order to succeed, complainants must prove the agreement to support, that it was the consideration for the deed, the failure to comply, and the intention at the beginning not to comply.

There is not much in the testimony of Mrs. Trice except that Newt wanted to come back and live with them and that she signed the deed unwillingly. Most of her testimony is reconcilable with McGill's. J. T. Trice does say that Newt urged him to make him a deed. He does not explain how the deed came to be made to the children, but he does say that Newt urged him to make the deed and promised to take care of him and his wife. The deed is dated July 6, 1922, and Newt came to live with them in October. He, Trice, went to W. H. Pierce, a banker, took him a deed containing a description of the property and told him to draw a deed to the children of Newt McGill. He says he told Pierce to put in the deed "if they don't do what they agreed to it shall be null and void." Pierce says Trice did not say anything of the kind to him. Newt did not go with his uncle and did not speak to Pierce about the matter. Trice does not say he told Pierce to put in the deed the agreement of McGill to support complainants so that the direction to put in that the deed should be void if they don't do what they agreed to do, would look strange without anything in the deed to show what they had agreed to do. As stated, the deed was dated July 6, and Newt did not move on the place until October. This in connection with the absence of any mention of the agreement to support in the deed, tends to support the contention of the appellants that the agreement to move on the place and support complainants was made after the deed was executed. Pierce did not write the deed but got a lawyer to prepare it. He, however, read it to complainants and took their acknowledgments. They knew what it contained and what it did not contain and they knew null and void was not in it. Trice admits this.

The proof shows that Newt McGill with his family moved on the place in October, 1922, and stayed until October, 1924. He improved the place, brought more ground into cultivation, built a crib, hen house, shed, etc. During at least twenty months of this time it is not contended that he did not care for and support complainants as well as could be expected under the circumstances. Disagreements, however, arose between complainants and the family of Newt. This family consisted of himself, his wife, the four children and his wife's father Jason Holmes. In 1924 all agree that there was fussing and quarrelling going on. McGill when asked who was doing the fussing and quarrelling said: "Uncle Johnny and my wife, mostly. Uncle Johnny doing most of it." While in this pro rata estimate Newt cannot be expected to be considered an

impartial witness, yet we think he is borne out by the record.  J. T. Trice, Uncle Johnny, did not like old man Jason Holmes, the father of Mrs. McGill. He does not attempt to conceal this in his testimony as will be seen from this excerpt:

"Q. You did abuse Mr. Holmes a good deal, didn't you? A. Not to her.

"Q. In her presence? A. No, I didn't.

"Q. Well where were you when you abused him? A. Me and Newt would be out and we would be talking.

"Q. Did you agree on what kind of man Mr. Holmes was, you and Newt? A. Me and Newt was all, and we got to talking about a road affair once and I did curse him some then.

"Q. So you did curse within the last fifteen years? A. Yes, fifteen years ago I did.

"Q. I am talking about while they lived there? A. I cursed him once.

"Q. Where was that time, in the house or out of the house? A. Out at the lot.

"Q. And Mrs. McGill didn't hear that? A. No, sir.

"Q. Did you talk about her father any at all in her presence? A. Not to abuse him.

"Q. Did you talk about him? A. Yes, of course we talked about people.

"Q. Did you talk kindly about him or slightingly? A. I don't know hardly how you might term it.

"Q. You never said anything good of him? A. I never said anything particular good or particular bad.

"Q. You did use some words in the house in her presence and the children you wouldn't call curse words, but you wouldn't want to use them in a Sunday School? A. I don't know about a Sunday School. I never went to one."

The other witnesses make this stronger, McGill says Trice spoke of Holmes as the Old Devil and Mrs. McGill when asked how Trice behaved in her presence toward her father says:

"A. I have often heard him say he didn't want the old devil there, and one time I come in and told Aunt Nannie he was sick and he said he wished the damned scoundrel would die.

"Q. Did you resent that? A. Not that time, but later on I told him I was getting tired of hearing of my people.

"Q. What did he say then? A. If I was, to quit listening."

Then once when Mrs. McGill and Aunt Nannie, Mrs. Trice, had some trivial misunderstanding, he said, "You are fussing at Nan-

nie. I'll come and break your damned neck." He does not deny but admits this.

As leading up to the situation as it existed when the McGill family left, it is well to consider some facts in the record. In 1923 Mrs. Trice had a long spell of sickness. The doctor diagnosed it as tuberculosis of the bowels and Mrs. McGill waited on the patient for the most part at least, and no charge is made that she was not attentive and faithful. The doctor advised that the house be screened to keep out flies and that the bedpan be emptied in a hole away from the house and a disinfectant used in the hole. Trice on one occasion emptied the bedpan on the level ground close to Mrs. McGill's room where the children played, and when she objected and referred to the doctor's orders, he grew very angry and abusive. Then he first ejected tobacco juice against the window screen and not being satisfied with this method of using the screen after Mrs. McGill had cleaned it while he was away, when he returned and his wife spoke about the matter, he said he would tear the damned thing out, and took his stick and knocked the wire out of the window. Then again the screen door annoyed him and he propped it open and when Mrs. McGill had one of the children follow after him and close the screen door, this made him very angry and he again said he would tear the damned thing down. Mrs. McGill with four children to protect, cannot be blamed for attaching importance to the directions of the doctor and we think Mr. Trice pays a tribute to her forbearance when he testifies that she did not swear, and he cannot be accused of being biased in her favor.

As to what took place in August, 1924, Trice and McGill do not differ much. Trice says: "I told Newt. Si Newt you know what it is" and he said "I am going to try to get me a place." and the agreement for Newt to move "was mutual as to him." Newt tells about what took place at this time in this way. He is telling about cutting the timber which is complained of, says he intended to clear the land and put it in cultivation. Asked if he got any of it in cultivation he says:

"No sir, I intended to clear it and had a family there in 1924, but Uncle Johnny, in August I believe it was, the first of August, he stopped me out there on the wagon at the old wheel house, he came out there and said 'Newt, the way things is going on here we can't all get along and I thought I'd tell you in time, you get you a home for another year, this is your last year here' and I said 'all right.' "

Newt McGill's past history is used for all that can be made of it to support a presumption of fraudulent intent. He lived with the complainants from the time he was eight or ten until about nine-

teen or twenty, when he married. During this time he gambled some and was arrested several times. Then later and some years before this deed was made, he was sent to the penitentiary for eight months for a fraudulent breach of trust, in using a trust fund, but the complainants knew all about that when Newt came to live with them in 1922. There is nothing in the record to show moral delinquency on his part from within several years preceding this transaction down to the present time. The court cannot conclusively presume from his past record under the circumstances of this case that he intended from the beginning to breach this contract. The indications are all to the contrary. He went to work with energy on the place; cleared up thickets and fence rows; erected outhouses; for the better part of two years lived up to his contract, when on his wife's account he would have been justified in leaving sooner than he did, and finally left when Trice told him to go. The indications are that Newt considered it to his advantage to stay and work the place and improve it. For taking care of the old couple who had given him a home he got the life estate rent free and made the place more valuable for his children when the life estate fell in. Why was it not to his interest to stay? We see nothing in the situation to suggest an intention at the inception of the agreement not to comply with it, but one can see much in what took place in 1923 and 1924 to induce him, after he had made the agreement to support, in the utmost good faith, to conclude that he must choose between Uncle Johnny and his wife. We could not blame him if he decided to obey the injunction to cleave to her in preference to all others, even including his uncle and his contract. And even then he did not go until practically ordered to do so. He says he did not want to go and Trice says he wanted him to go. The weight of the evidence seems to indicate that Trice and not McGill, was responsible for the going.

The testimony suggests that Newt and Uncle Johnny could get mad and scrap verbally and soon get in a good humor again, also that Mrs. Trice and Mrs. McGill got along pretty well, but of the fussing of Trice, Mrs. McGill got tired, yet she exhibited forbearance. Newt says when he agreed to move back to the place in August, 1922, he took Uncle Johnny aside and warned him that his dislike of Mrs. McGill's folks was apt to cause trouble, and that Trice promised to be very careful in this regard. This is not denied and it is significant. Instead of being more careful as he grew older, he grew worse until the end of the agreement came.

In our opinion it matters little what view is taken of this agreement. Whether that it was made at the time of the execution of the deed to the children or afterwards; whether it was made as

consideration for the deed to the children or simply in consideration for the use of the place without rent, the complainants have failed to make out a case that justified the court below in setting aside and cancelling the deed to the children.

There is much complaint of McGill for cutting and selling the timber on the place. The proof shows the land would have been, when cleared up, good for cultivation, and would have been more valuable for cultivation than in timber. McGill intended to clear it up and put it in cultivation, and we think complainants understood this and did not object, but as he got $200 out of the timber and did not clear the land, we will not disturb this part of the decree, even if it is subject to review in the way the case comes up. But in so far as the decree sets aside the deed to the children of Newt McGill, it is reversed. The claim of Mrs. McGill for the amount paid by her to discharge an encumbrance on the land was presented by her only in case the deed to the children was set aside. The decree of this court leaving the deed in force, her claim is automatically withdrawn. As to so much of the decree as denied a recovery to complainants as to the claim for rent and insurance, it is at least doubtful whether this is subject to review in the state of the appeal, but if it is, we see no reason to change this part of the decree. The complainants will pay the costs of both courts. As to the costs of the court below, judgment will go against them and the surety on their cost bond.

Owen and Senter, JJ., concur.